**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

———————————————————— )
KEVIN PHILLIPS,                        )
                                       )
            Plaintiff,                 )
                                       )        3:12-cv-00344-RCJ-WGC
        vs.                            )
                                       )
C.R. BARD, INC. et al.,                )        **ORDER**
                                       )
            Defendants.                )
———————————————————— )

This case arises out of an allegedly defective surgically implanted medical device.

Pending before the Court is a Motion for Summary Judgment (ECF No. 167) and four Motions

in Limine (ECF Nos. 161, 164, 168, 171).  For the reasons given herein, the Court denies the

motions in limine and grants the motion for summary judgment in part.

I.      **FACTS AND PROCEDURAL HISTORY**

The inferior vena cava ("IVC") is a vein that returns blood to the heart from the lower

body. (Compl. ¶ 15, ECF No. 1-1).  An IVC filter is a medical device residing in the IVC that

catches blood clots or "thrombi" that travel from the lower portions of the body towards the heart

and lungs, where they can cause serious injury or death. (*Id.* ¶¶ 14–16).  IVC filters have been on

the market since the 1960s. (*Id.* ¶¶ 13, 18).  The first IVC filters were "permanent" filters, i.e.,

designed to remain in the patient for the patient's life. (*Id.* ¶ 18). In 2003, manufacturers began producing "optional" or "retrievable" IVC filters that can be removed from a patient once the risk of a blood clot has subsided. (*Id.*). At issue in the present case is the Recovery Filter System ("RFS"). Defendants C.R. Bard, Inc. and Bard Peripheral Vascular, Inc. (C.R. Bard's subsidiary) "designed, set specifications [for], manufactured, prepared, compounded, assembled, processed, marketed, distributed, and sold the Recovery Filter System and G2 Filter System ("G2FS") to be implanted in patients . . . ." (*Id.* ¶¶ 3–4). Although Plaintiff makes general allegations concerning the G2FS, as well as the RFS, he alleges only having had a defective RFS implanted in him. (*See id.* ¶¶ 49–51).

Due to manufacturing and design defects, the RFS has a high fracture and migration rate as compared to other IVC filters, and these defects can cause serious injury or death. (*See id.* ¶¶ 25–30). Defendants failed to conduct clinical testing such as animal studies on the RFS, and even after they became aware of large numbers of adverse event reports ("AER") from health care providers reporting serious injury or death due to the migration of the entire device or fractured pieces of the device, they failed to recall the RFS or even warn those who had been implanted with one, although they withdrew the RFS from the market. (*See id.* ¶¶ 31–35, 43–48). Plaintiff makes similar allegations concerning the G2FS, but again, he does not allege having been implanted with a G2FS. (*See id.* ¶¶ 36–42).

Plaintiff was implanted with Defendants' RFS on August 4, 2005. (*Id.* ¶¶ 49–50). The RFS subsequently failed and migrated to Plaintiff's heart, perforating his heart and causing severe and life-threatening complications requiring emergency open-heart surgery on April 30,

2010, and resulting in various economic and non-economic damages. (*Id.* ¶ 51).  Plaintiff sued

Defendants in state court for: (1) negligence; (2) strict products liability—failure to warn; (3)

strict products liability—design defects; (4) strict products liability—manufacturing defects; (5)

breach of the implied warranty of merchantability; (6) negligent misrepresentation; and (7)

violation of the Deceptive Trade Practices Act ("DTPA"), Nevada Revised Statutes

§§ 598.0915(5), (15), 598.0923(2), and 598.0925(1)(a).  Defendants removed, demanded a jury

trial, and answered.  Defendants have filed four motions in limine and a motion for summary

judgment.  Although Defendants state therein that they request summary judgment against all

claims, they have made no arguments against the seventh claim for violations of the DTPA.

## II.     LEGAL STANDARDS

### A.     Motions in Limine

A motion in limine is a procedural device to obtain an early and preliminary ruling on the

admissibility of evidence.  Black's Law Dictionary defines it as "[a] pretrial request that certain

inadmissible evidence not be referred to or offered at trial.  Typically, a party makes this motion

when it believes that mere mention of the evidence during trial would be highly prejudicial and

could not be remedied by an instruction to disregard." Black's Law Dictionary 1171 (10th ed.

2014).  Although the Federal Rules of Evidence do not explicitly authorize a motion in limine,

the Supreme Court has held that trial judges are authorized to rule on motions in limine pursuant

to their authority to manage trials. *See Luce v. United States*, 469 U.S. 38, 41 n.4 (1984) (citing

Fed. R. Evid. 103(c) (providing that trial should be conducted so as to "prevent inadmissible

evidence from being suggested to the jury by any means")).

Judges have broad discretion when ruling on motions in limine. *See Jenkins v. Chrysler Motors Corp.*, 316 F.3d 663, 664 (7th Cir. 2002).  However, a motion in limine should not be used to resolve factual disputes or weigh evidence. *See C&E Servs., Inc., v. Ashland, Inc.*, 539 F. Supp. 2d 316, 323 (D.D.C. 2008).  To exclude evidence on a motion in limine "the evidence must be inadmissible on all potential grounds." *E.g.*, *Ind. Ins. Co. v. Gen. Elec. Co.*, 326 F. Supp. 2d 844, 846 (N.D. Ohio 2004).  "Unless evidence meets this high standard, evidentiary rulings should be deferred until trial so that questions of foundation, relevancy and potential prejudice may be resolved in proper context." *Hawthorne Partners v. AT&T Tech., Inc.*, 831 F. Supp. 1398, 1400 (N.D. Ill. 1993).  This is because although rulings on motions in limine may save "time, costs, effort and preparation, a court is almost always better situated during the actual trial to assess the value and utility of evidence." *Wilkins v. Kmart Corp.*, 487 F. Supp. 2d 1216, 1219 (D. Kan. 2007).

In limine rulings are preliminary and therefore "are not binding on the trial judge [who] may always change his mind during the course of a trial." *Ohler v. United States*, 529 U.S. 753, 758 n.3 (2000); *accord Luce*, 469 U.S. at 41 (noting that in limine rulings are always subject to change, especially if the evidence unfolds in an unanticipated manner).  "Denial of a motion in limine does not necessarily mean that all evidence contemplated by the motion will be admitted to trial.  Denial merely means that without the context of trial, the court is unable to determine whether the evidence in question should be excluded." *Ind. Ins. Co.*, 326 F. Supp. 2d at 846.

///

///

B.      **Summary Judgment**

A court must grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Material facts are those which may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *See id.*  A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).  In determining summary judgment, a court uses a burden-shifting scheme:

> When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.  In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case.

*C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations and internal quotation marks omitted).  In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex Corp.*, 477 U.S. at 323–24.  If the moving party fails to meet its initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).

If the moving party meets its initial burden, the burden then shifts to the opposing party to establish a genuine issue of material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987).  In other words, the nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations unsupported by facts. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).  Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *Celotex Corp.*, 477 U.S. at 324.

At the summary judgment stage, a court's function is not to weigh the evidence and determine the truth, but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249.  The evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.  But if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *See id.* at 249–50.

## III.   ANALYSIS

### A.   Motions in Limine

### 1.   Motions Nos. 161 and 164

Defendants in both of these motions ask the Court to exclude the opinions of Dr. Suzanne Parisian.  In Motion No. 161, they ask the Court to exclude her opinions because she should not

be permitted to testify as an expert under *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993).  The relevant standard is not found in the *Daubert* line of cases, however, but in the latest version of Evidence Rule 702, which has superseded those cases' interpretations of the original 1975 version of the rule. *See* David E. Bernstein, *The Misbegotten Judicial Resistance to the* Daubert *Revolution*, 89 Notre Dame L. Rev. 27, 28, 49–50 (2013).  The standard for the admission of expert testimony is therefore:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702 (2000).  Under the rule, the Court must find that that the witness is an expert, which means that he possesses specialized knowledge that will aid the jurors in assessing some particularized type of evidence beyond the jurors' own lay understanding, Fed. R. Evid. 702(a), and that his or her testimony is the product of reliable principles and methods reliably applied to sufficient facts or data of the case. Fed. R. Evid. 702(b)–(d).  A court may not simply determine that the witness is an expert and then take the witness's word that the reliability requirements have been met.

As Defendants note, Dr. Parisian has no expertise in engineering or metallurgy, has never designed or tested an IVC filter, has never treated any patient with an IVC filter, and has not treated any patient at all since the 1980s.  In response, Plaintiff argues that Dr. Parisian is a former FDA employee in the division overseeing medical devices.  The Court finds that Dr. Parisian is an expert in the relevant FDA regulations, and perhaps in medical device testing, but not in medical device design itself.  Defendants also argue that Dr. Parisian often gives rambling, argumentative answers to questions, and that she serves more as a professional witness who gives plaintiffs' closing arguments from the stand than as an expert witness as to industry standards of care.  The Court, of course, will not permit that kind of testimony, but that is not relevant to her qualifications as an expert.  Many expert witnesses are professional witnesses. That is the nature of the expert witness system.  As to being an advocate for one side or the other, Defendants may impeach Dr. Parisian as to her bias, but that is a matter separate from her qualifications as an expert.  The Court disagrees that Dr. Parisian's conclusions that Defendants violated this or that regulation amount to legal conclusions on ultimate issues.  Defendants are not charged in the present case with violations of any regulations.  Their alleged violations of regulations are merely relevant to whether they satisfied the standard of care.  Violation of a regulation can in some cases result in a finding of negligence per se.  At a minimum, it is relevant to the issue of negligence, and experts may testify as to industry standards.  In this case, it appears that Dr. Parisian will testify as to FDA regulations for testing based on her particular experience in this area, and whether Defendants violated them with respect to the medical devices at issue.

Defendants also argue that Dr. Parisian's methods are unreliable.  Defendants note that Dr. Parisian's report does not explain her methods, and that her answer at her deposition was "vague and generic."  The excerpt included in the motion indeed gives the Court concern.  The answer is indeed vague and confusing.  But at the time Dr. Parisian gave that answer, she was expecting to testify as an expert not only on FDA regulations, but presumably on design and testing, as well.  As the Court has noted, it is not likely to admit her as to design, and this answer makes it even more unlikely.  As to the areas in which the Court is likely to admit Dr. Parisian, i.e., governmental regulations and perhaps the appropriateness of testing as to a given device, no detailed scientific methods would be expected.  The Court will permit her to explain her methods of comparing Defendants' actions to FDA regulations and industry testing standards at trial.  The Court will not exclude Dr. Parisian at this time.  Defendants may inquire of Dr. Parisian at trial, at which time the Court will make its final ruling.  Based on what the Court has seen thus far, it is likely to admit Dr. Parisian as an expert on FDA regulations generally, industry standards for medical device testing, and whether Defendants complied with those with respect to the relevant medical devices, but the Court is likely not to permit her to testify as an expert as to proper design of the device itself or causation of injuries.

In Motion No. 164, Defendants ask the Court to exclude Dr. Parisian's testimony altogether for violations of the Court's March 29, 2013 order.  Specifically, Defendants complain that Dr. Parisian relied in part on the "Lehman Report," a report produced by Defendants' consultant Dr. John Lehman that was accidentally disclosed to Plaintiff's counsel in a previous lawsuit.  In a March 29, 2013 order, Magistrate Judge Cobb ruled that the Lehman report was

privileged as work product.  Defendants are correct that Magistrate Judge Cobb, after lengthy

hearings and in a lengthy, thorough order, ruled that the Lehman Report and related

correspondence is protected work product. *See Phillips v. C.R. Bard*, 290 F.R.D. 615, 645–61 (D.

Nev. 2013) (Cobb, Mag. J.).  Plaintiff responds that Dr. Parisian has a copy of the Lehman

Report—because she is a defense expert in other cases where the report is not protected—and in

the present case she has relied only on that data in the report that is also available from non-

privileged sources.  Plaintiff argues that Dr. Parisian can and will testify as to the opinions in her

own report in the present case without reference to the Lehman Report.

   The Court denies the motion.  Plaintiff is correct that disclosure of the Lehman Report to

Dr. Parisian in cases where the report is not protected does not violate the Court's order in this

case.  It is not disclosure in-and-of-itself that would violate such an order but the unpermitted use

of the information disclosed.  If it becomes clear at trial that Dr. Parisian is testifying based on

information that she cannot have obtained from anywhere but the Lehman Report, the Court may

exclude any such testimony.

   **2.    Motion No. 168**

   Defendants ask the Court to exclude the opinions of Dr. Daniel Link, a radiologist.  As

with Dr. Parisian, the Court will wait until Dr. Link can be questioned at trial before making any

final determination to exclude his testimony.  The Court is likely to exclude Dr. Link's potential

testimony as to IVC filter design and labelling, as he indeed appears to have admitted in his

deposition that he is simply not an expert in those areas.  The Court is not likely to exclude his

testimony as to causation.  Dr. Link appears to be an expert in IVC filter use, having implanted

over 1500 of them himself, and he is therefore likely qualified to testify as to the cause of Plaintiff's IVC filter failure.  His opinions are based, *inter* alia, on a review of medical and imaging records and the implanting physician's testimony.

> **3.     Motion No. 171**

Defendants ask the Court to exclude the opinions of Michael Freeman, Ph.D.  Dr. Freeman intends to testify that Defendants' IVC filter was failing at a higher rate than those of other companies and that Defendants knew of this but took no action to correct it.  The Court, again, will make no final determination here but is likely to accept Dr. Freeman's expert testimony in this area at trial.  As Plaintiff notes in response, Dr. Freeman has training in biostatistics and analyzed adverse event date from two separate sources, comparing Defendants' device's rate of failure with that of other similar devices.

> **B.     Motion for Summary Judgment**

Plaintiff has brought the following claims: (1) negligence; (2) strict products liability—failure to warn; (3) strict products liability—design defects; (4) strict products liability—manufacturing defects; (5) breach of the implied warranty of merchantability; (6) negligent misrepresentation; and (7) violation of the Deceptive Trade Practices Act ("DTPA"), Nevada Revised Statutes §§ 598.0915(5), (15), 598.0923(2), and 598.0925(1)(a).  The Court will address the motion for summary judgment in the order that the motion itself addresses the claims.

> **1.     Manufacturing and Design Defects - Claims 1, 3, and 4**

Defendants argue that Plaintiff has offered no evidence of a manufacturing or design defect in Plaintiff's IVC filter.  Plaintiff responds that he may rely on the doctrine of *res ipsa*

*loquitor*.  The Court finds that an extended passage from *Allison v. Merck & Co., Inc.*, 878 P.2d
948 (Nev. 1994) is appropriate to explain the viewpoint taken by the Nevada Supreme Court on
the matter:

> To establish liability under a strict tort liability theory, Thomas must
> establish that his injury "was caused by a defect in the product, and that such
> defect existed when the product left the hands of the defendant." *Shoshone Coca–
> Cola Co. v. Dolinski*, 82 Nev. 439, 443, 420 P.2d 855, 858 (1966).  In this case,
> whether any defect in the vaccine that might have caused Thomas's disabilities
> was present "when the product left the hands of the defendant[s]" is not a matter
> of controversy; so, if the Allisons can prove that Thomas' encephalitis "was
> caused by a defect in the product," then plaintiffs should be able to recover from
> Merck.
>
> We have already considered the meaning of the word "defect" in
> connection with strict products liability.  In *Ginnis v. Mapes Hotel Corp.*, we
> adopted a definition of "defect" that is still useful and applicable to the case at
> hand: "'Although the definitions of the term "defect" in the context of products
> liability law use varying language, all of them rest upon the common premise that
> those products are defective which are dangerous because they fail to perform in
> the manner reasonably to be expected in light of their nature and intended
> function.'" 86 Nev. 408, 413, 470 P.2d 135, 138 (1970) (quoting *Dunham v.
> Vaughn & Bushnell Mfg. Co.*, 42 Ill.2d 339, 247 N.E.2d 401, 403 (1969)).  If
> Thomas can establish that the vaccine caused him to suffer permanent brain
> damage, then surely the vaccine failed to perform in the manner reasonably to be
> expected "in light of [its] nature and intended function."  The nature and intended
> function of this vaccine, of course, is to create an immunity to measles, mumps
> and rubella without attendant blindness, deafness, mental retardation and
> permanent brain damage.
>
> Under the law of strict liability in this state, responsibility for injuries
> caused by defective products is properly fixed wherever it will most effectively
> reduce the hazards to life and health inherent in defective products that reach the
> market.  Although manufacturers are not insurers of their products, where injury
> is caused by a defective product, responsibility is placed upon the manufacturer
> and the distributor of the defective product rather than on the injured consumer.
> *See Stackiewicz v. Nissan Motor Corp.*, 100 Nev. 443, 448, 686 P.2d 925, 928
> (1984); *see also Nat'l Union Fire Ins. v. Pratt and Whitney*, 107 Nev. 535, 815
> P.2d 601 (1991).

In *Stackiewicz*, we allowed a strict liability case to go to the jury on the plaintiff's claim of an idiopathic steering defect in an automobile which the plaintiff claimed was the cause of her injuries. We said in *Stackiewicz* that when "'machinery "malfunctions," it obviously lacks fitness regardless of the cause of the malfunction.'" *Id.* at 448–49, 686 P.2d at 928 (quoting *Lindsay v. McDonnell Douglas Aircraft Corp.*, 460 F.2d 631, 639 (8th Cir. 1972)). In the case before us, plaintiffs are claiming in effect that the vaccine "malfunctioned"; and, if we are to follow *Stackiewicz*, then a vaccine which causes permanent brain damage "obviously lacks fitness regardless of the cause of the malfunction." If the vaccine is found by a factfinder to have caused Thomas to develop the disabling encephalitis, then Merck's "'"sin" is the lack of fitness as evidenced by the malfunction itself rather than some specific dereliction by the manufacturer.'" *Id.* 100 Nev. at 449, 686 P.2d at 928 (quoting *Lindsay*, 460 F.2d at 639).

Unless we are going to abandon long-standing public policy grounds for holding manufacturers and distributors of defective products responsible for injuries caused by manufactured products that prove to be defective, Thomas must be given an opportunity to prove that a malfunctioning vaccine caused his injuries, just as we allowed Ms. Stackiewicz to try to prove that her injuries were caused by a defective steering mechanism. The public policy considerations that support holding the defendants liable in this case (if plaintiffs can prove that the vaccine caused his injuries) were put well by Professor Prosser in the noted law review article, "The Fall of the Citadel":

> The public interest in human safety requires the maximum possible protection for the user of the product, and those best able to afford it are the suppliers of the chattel. By placing their goods upon the market, the suppliers represent to the public that they are suitable and safe for use; and by packaging, advertising and otherwise, they do everything they can to induce that belief . . . .

50 Minn. L. Rev. 791, 799 (1966). This concept of "public interest" is the guiding principle of our present opinion.

If we are going to follow *Shoshone Coca–Cola* and *Stackiewicz*, we must send this case back to the trial court. A vaccine that causes blindness and deafness is a defective product. Causation is a factor yet to be determined by a factfinder.

*Id.* at 767–69 (footnotes omitted). In the present case, therefore, Plaintiff may prove a defect—

the Allison opinion makes clear that the Nevada Supreme Court does not particularly care

whether it is characterized as a manufacturing defect or a design defect—by proving that the failure of the IVC filter caused his harm.  Just as the Plaintiff in *Allison* could prove a defect in a vaccine by proving that it caused brain damage, i.e., that it "failed to perform in the manner reasonably to be expected," Plaintiff here could prove a defect by proving that the IVC filter caused him harm that could only occur if it "failed to perform in the manner reasonably to be expected."  As the *Allison* Court noted, in *Stackiewicz* it had ruled that when machinery malfunctions, it obviously lacks fitness, regardless of the cause of the malfunction.  The allegations here are that the IVC filter did not remain in place when blood clots engaged it, as it was clearly intended and expected to do—that was its only purpose—but that it did not properly secure itself against the walls of the IVC and therefore slipped when blood clots engaged it, ultimately lodging in his heart and causing harm.  That is an allegation that the product failed to perform in the manner reasonably to be expected.

The Court therefore finds that whether there was a defect in the present case (in design or manufacture) rests on causation, which Defendants have separately argued.  Just as the Nevada Supreme Court ruled that the plaintiffs in *Allison* and *Stackiewicz* had to be given an opportunity to prove that a malfunctioning product caused their injuries, so must Plaintiff here.

### 2.     Causation - All Claims

Defendants argue that Plaintiff has provided no evidence on causation.  The Court disagrees.  There is a genuine issue of material fact whether a defect in the IVC filter caused the injury in this case.  As Plaintiff correctly notes, causation can be proved in Nevada under a but-for theory or under a "substantial factor" theory. *See Wyeth v. Rowett*, 244 P.3d 765, 778 (Nev.

2010.  Even if Plaintiff were to admit, as Defendant argues, that the IVC filter was placed at a poor angle, a jury could find that poor design was a substantial factor in causing the injury.  The Court cannot say at this stage that the substantial factor theory will not be supported by the trial evidence, even assuming Defendants could prove the IVC filter was improperly implanted, which is disputed.  At this stage, the evidence would appear to support alternative causation instructions under either theory.  And the Court has noted that it is likely to accept Dr. Link's expert testimony as to the causation of the IVC filter's migration.  The Court therefore denies summary judgment against the claims on the basis of inability to prove causation.

3.    **Failure to Warn - Claims 1 and 2**

Defendants argue that there is no dispute that they adequately warned of the precise complication that arose in this case, and that the implanting physician has admitted he was aware of it.  The Court agrees with Plaintiff, and with Judge Hunt, that the learned intermediary doctrine did not apply in Nevada to impute the knowledge of a treating physician to the patient with respect to failure-to-warn claims as of 2002. *See Gennock v. Warner-Lambert Co.*, 208 F. Supp. 2d 1156, 1160 (D. Nev. 2002) (Hunt, J.) (citing *Allison*, 878 P.2d 948).  But Defendants are correct that the Nevada Supreme Court later adopted the doctrine. *See Klasch v. Walgreen Co.*, 264 P.3d 1155, 1158–9 (Nev. 2011):

> [W]e first adopt the learned-intermediary doctrine in the context of pharmacist/customer tort litigation and hold that pharmacists have no duty to warn of a prescribed medication's generalized risks.
>
> We next consider whether the learned-intermediary doctrine likewise insulates a pharmacist from liability when he or she has knowledge of a customer-specific risk.  Following the modern trend of case law, we conclude that the learned-intermediary doctrine does not foreclose a pharmacist's potential for

liability when the pharmacist has knowledge of a customer-specific risk.  Instead, under these circumstances, a pharmacist has a duty to exercise reasonable care in warning the customer or notifying the prescribing doctor of the risk.

*Id.*

The Court can discern no reason why the doctrine should not also apply here.  The Court perceives Plaintiff's failure-to-warn claim as a grievance against a failure to warn of the general risks of the IVC filter at issue, not risks that were only specific to Plaintiff, so Defendants are entitled to summary judgment as to liability for failing to warn Plaintiff of any risks for which they in fact warned Plaintiff's physician.

Defendants provide evidence of the warnings provided to Plaintiff's physician that, *inter alia*, "movement or migration of the filter is a known complication of vena cava filters." Dr. Hansen also testified that he had independent knowledge of the risks of IVC filters.  Plaintiff argues that even if the learned intermediary doctrine applies, Defendants' generalized warning about IVC filters was not adequate given its knowledge that its own filter had higher rates of failure than typical filters.  The Court finds that Plaintiff has satisfied his shifted burden on summary judgment in this regard, even assuming Defendants have satisfied their initial burden. Whether a warning is adequate is usually a jury question. *See Allison*, 878 P.2d at 961.  Here, it is a jury question whether Defendants' generalized warnings about IVC filters was adequate given what they knew about their own filter.  There is a genuine issue of material fact whether Defendants adequately warned Dr. Hansen of the risks of using their IVC filter by warning him of the general risks associated with similar products (of which he was already aware, in any case).

### 4.        Breach of Implied Warranty of Merchantability - Claim 5

Defendants argue this claim is barred under Nevada law, and that Plaintiff has not provided evidence to support it, in any case. The Court agrees that this claim fails for lack of contractual privity between Plaintiff and Defendants. *See Long v. Flanigan Warehouse Co.*, 382 P.2d 399, 402–03 (Nev. 1963) ("[S]ome recent decisions have declared that lack of privity is not a defense to a claim based upon breach of implied warranty. . . . We decline to follow their reasoning."). The *Long* Court noted that the law of negligence and strict liability was the appropriate vehicle for a non-privy to obtain relief in these situations. *See id.* at 403. In other words, a claim for a breach of the implied warranty of merchantability is in the present case superfluous in light of the products liability claims. Plaintiff does not respond to the arguments against this claim, and the Court grants summary judgment.

### 5.        Negligent Misrepresentation - Claim 6

Defendants argue this claim fails as a matter of law because even assuming Plaintiff detrimentally relied on any of Defendants' alleged misrepresentations, the information was not supplied to Plaintiff for his guidance in a business transaction. *See, e.g.*, *Barmettler v. Reno Air, Inc.*, 956 P.2d 1382, 1387 (Nev. 1998) (quoting Restatement (Second) of Torts § 552) ("The thrust of Reno Air's argument is that this tort only applies to business transactions; thus, in the context that Reno Air implemented its Drug and Alcohol Policy, this conduct does not fit squarely within a business or commercial transaction. We agree."). The Court agrees. The gravamen of a decision to accept medical care—although it ultimately includes an economic transaction between a patient, his insurer, and the provider—is not a business transaction. An

attending physician would have a better claim against the manufacturer of a defective medical device under this cause of action than a patient would, because the practitioner relies on his venders' representations in the course of his business (providing medical care) and may be economically harmed via a lawsuit against him by a patient if those representations are false. Plaintiff does not respond to the arguments against this claim, and the Court grants summary judgment.

### 6.    Punitive Damages

Defendants argue that punitive damages are not permitted because Plaintiff has adduced no evidence of malice.  Under Nevada law, punitive damages are only available to a plaintiff who proves by clear and convincing evidence that the defendant is guilty of "oppression, fraud, or malice, express or implied." Nev. Rev. Stat. § 42.001.  No fraud is alleged here.  The types of conduct that might apply in this case are therefore "malice" or "oppression," which are respectively defined as "conduct which is intended to injure a person or despicable conduct which is engaged in with a conscious disregard of the rights or safety of others" and "despicable conduct that subjects a person to cruel and unjust hardship with conscious disregard of the rights of the person." *See id.*

"[D]espicable conduct which is engaged in with a conscious disregard of the rights or safety of others" implies that recklessness may suffice, but the Nevada Supreme Court has noted that gross negligence or recklessness is not enough to support punitive damages. *Wyeth v. Rowatt*, 244 P.3d 765, 783 (Nev. 2010).  Refusal to remedy a known dangerous situation has been held not to support punitive damages in Nevada, without more. S*ee Maduike v. Agency*

*Rent-A-Car*, 953 P.2d 24, 26–27 (Nev. 1998).  In *Maduike*, a rental car company refused to

repair the brakes on a vehicle or replace the car when the plaintiffs brought the car back to the

company after experiencing problems with the brakes. *See id.* at 25.  The plaintiffs drove the car

home and crashed because of the faulty brakes. *Id.*  The Nevada Supreme Court affirmed the

district court's dismissal of the punitive damages claim because the facts did not amount to

conscious disregard of the plaintiffs' rights for the purposes of the punitive damages statute. *See

id.* at 26–27.  The Court noted that "even unconscionable irresponsibility will not support a

punitive damages award." *Id.* at 26 (quoting *First Interstate Bank v. Jafbros Auto Body*, 787 P.2d

765, 767 (Nev. 1990)).

  The Court later retreated from this approach, however, and ruled that the disjunctive

"implied malice" prong of the punitive damages statute permits such damages for "conscious

disregard" of unsafe conditions. *See Countrywide Home Loans v. Thitchener*, 192 P.3d 293, 253–

55 & n.51 (Nev. 2008).  "'Conscious disregard' means the knowledge of the probable harmful

consequences of a wrongful act and a willful and deliberate failure to act to avoid those

consequences." Nev. Rev. Stat. § 42.001(1).  This is the standard applicable to the availability of

punitive damages for "implied malice."

  Plaintiffs have proffered evidence that a reasonable jury could believe shows that

Defendants knew that their IVC filter was unsafe but continued to market and distribute it,

anyway.  The Court therefore denies the motion to preclude punitive damages.

///

///

## CONCLUSION

IT IS HEREBY ORDERED that the Motions in Limine (ECF Nos. 161, 164, 168, 171) are DENIED.

IT IS FURTHER ORDERED that the Motion for Summary Judgment (ECF No. 167) is GRANTED IN PART and DENIED IN PART. The Court grants summary judgment to Defendants on the fifth and sixth claims for breach of the implied warranty of merchantability and negligent misrepresentation, respectively, but otherwise denies it.

IT IS FURTHER ORDERED that the Motions to Seal (ECF Nos. 162, 165, 169, 186, 188) are GRANTED.

IT IS SO ORDERED.

Dated this 16th day of December, 2014.

_____
ROBERT C. JONES
United States District Judge